IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2009

## STATE OF TENNESSEE v. ROBIN LYNN COOPER, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 88529     Kenneth F. Irvine, Jr., Judge**

_____

**No. E2009-00291-CCA-R3-CD - Filed June 21, 2010**

_____

The defendant, Robin Lynn Cooper, was convicted of attempted second degree murder, a Class B felony; rape, a Class B felony; aggravated rape, a Class A felony; especially aggravated kidnapping, a Class A felony; and three counts of aggravated kidnapping, a Class B felony. The convictions for the Class B felony kidnappings were merged into one count. The defendant was sentenced to life without parole as a repeat violent offender for the rape, aggravated rape, especially aggravated kidnapping, and three convictions of aggravated kidnapping and to a concurrent sentence of twelve years at thirty percent for attempted second degree murder. On appeal, he argues that: the evidence was insufficient to support his convictions; the trial court erred in admitting evidence; the trial court abused its discretion when it failed to grant a continuance; and the presence of his parole officer's folder on the witness stand violated a court order that the State could not mention that he was on parole. After careful review, we affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Michael T. Cabage, Knoxville, Tennessee, for the appellant, Robin Lynn Cooper, Alias.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At trial, the victim, Tammy Moody, testified that the defendant approached her and solicited her for prostitution. The victim testified that she agreed to perform oral sex on the defendant in exchange for fifty dollars and that the defendant drove the victim to his home, locking the door from the inside with a key. The victim testified that the defendant's demeanor changed when she asked for the money and that he told her, "[I]f you want to live, you'll do what I say."

The victim testified that the defendant took her to a bedroom where a stripped bed was laid on top of a tarp and a pornographic video was playing on the television. The defendant forced her to remove her clothes and then grabbed her by the throat. The victim testified that she knew she had to "do anything and everything" to stay alive. The defendant then forced his penis into her mouth and held the victim's head. He forced himself down her throat to the point that she was unable to breathe, causing her to vomit on the defendant.

The victim testified that the defendant put her on the bed, choked her while he was on top of her, and that she faded in and out of consciousness as a result. She recalled that the defendant told her, "Robin does what Robin wants to do. Robin wants to kill you, he'll do it." She said that the defendant also told her that his face was the last face she would ever see. The victim urinated and defecated on the bed. The defendant rolled her over and penetrated her anus with a large rubber dildo. The victim tried to cry out from the pain, but the defendant pressed her head into a pillow on the bed. The defendant then penetrated her anus with his penis and also penetrated her vagina with his penis and the dildo.

She estimated that the ordeal lasted from approximately 6:00 p.m. to 9:00 p.m. when the defendant's phone rang. The defendant answered the phone and appeared agitated after the call. He told the victim to sit on the bed and to shut-up. She tried to think of a way out of the situation and told the defendant to relax. He allowed her to shower but made her keep the bathroom door open. The defendant's girlfriend, Jennifer Abdelrahman, arrived at the house while the victim was in the shower. The victim thought the girlfriend looked frightened. The girlfriend gave the victim a shirt and some pants. The girlfriend made a phone call on her cellular telephone and distracted the defendant, which allowed the victim to escape.

The victim testified that she ran and hid behind an air-conditioning unit next to a large house. She waited there for approximately twenty minutes before running down the street, knocking on doors and attempting to get someone to call the police. The victim flagged down a pizza delivery man who took her near her home and gave her a pizza. The victim did not call the police on the night of the crimes because she wanted to talk to Detective Jeremy Maupin, a police officer she trusted.

When she reached the detective, he told her to go to the hospital. However, the victim said she did not go to the hospital because she did not have insurance. The victim's throat and tongue were swollen after the crimes, and she believed that she had a bone "loose" in her throat. Her ears bled on the day after the incident, and she said that she had bruises for a long time afterward. She also testified that she had blood in her stool for approximately a month after the rape.

Corey Woods testified that he worked for Snappy Tomato Pizza on December 12, 2007, and that he was flagged down by the victim at approximately 11:30 p.m. that night. He stopped for her after he saw her try unsuccessfully to flag down two ambulances. The victim told him, "Thank God you . . . stopped for me. There's a man trying to kill me." Woods said that the victim was not wearing shoes and that he gave her a pizza and took her near the hotel where she said she was staying.

Detective Maupin testified that he had been with the Knoxville Police Department for seven and one-half years. He said that he knew the victim as a prostitute and that she was always honest with him and admitted when she was doing wrong. He received a message from the victim on December 13, 2007, but, because he was on vacation, did not speak to her until he returned to work the following week. He met with the victim, and she acted differently from their usual encounters. She was paranoid and frightened, and her voice sounded raspy and distorted. He testified that the victim's face and throat were bruised. The victim gave him the pants that she wore on the night of the crime, and they appeared to be blood stained.

Investigator Andrew Boatman, of the Knoxville Police Department, testified that he assisted in the interview with the victim. He said that he observed bruising on her neck and recalled that she complained of additional injuries and had difficulty speaking. He said that he participated in the execution of a search warrant at the home of the defendant, where they secured items including a blue comforter, a blue blanket, a roll of duct tape, and a rubber dildo. They also took the bed sheets because a technician took a reading that indicated they might contain bodily fluids. The defendant's girlfriend was at the residence when the search warrant was executed, and she appeared angry.

Sally Helton, a forensic nursing expert, testified that she performed a "danger assessment" of the victim on January 17, 2008, and determined that the victim had injuries that were consistent with strangulation. She believed it was possible that the victim sustained nerve damage as a result of the attack.

Bernice Phillips testified that she knew the defendant and his girlfriend and that she had talked to them on the night of December 12, 2007. She said that she received a message

-3-

from the defendant's girlfriend, which was played for the court. On the audiotape, the defendant's girlfriend identified herself, reported that the defendant had a prostitute at the house, and asked the unidentified person to tell what the defendant did to her. The unidentified person said, "He choked me. He threatened me. He tried to kill me."

In his defense, the defendant testified that he met the victim at a gas station, where he propositioned her for sex. He said that he took her to his house because he was leery of the hotel and neighborhood where she was staying. He said that they talked at his house and became comfortable with each other. The defendant testified that he asked the victim to shower because "some of the girls on Magnolia aren't that clean." He said that the victim performed oral sex on him after the shower.

The defendant said that the bedroom was being renovated at the time. He said that the victim stopped performing oral sex because it was "taking too long, and she got hungry." He said that he made pancakes for the victim and, after eating, they had sex but were interrupted by his girlfriend. He said this was not the first time that his girlfriend had caught him with another woman. He testified that he did not force the victim to have sex with him and did not strangle her. He claimed that he had the rubber dildo because he was unable to sexually satisfy his girlfriend.

At the conclusion of the trial, the jury found the defendant guilty of attempted second degree murder, rape, aggravated rape, especially aggravated kidnapping, and three counts of aggravated kidnapping. He was sentenced to life without parole and a concurrent sentence of twelve years. This appeal followed.

Analysis

The defendant argues that the evidence was insufficient to support his convictions. Specifically, he contends that there was no physical evidence to substantiate the victim's claims. This court does not reweigh or reevaluate the evidence in determining sufficiency. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict, once approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the State. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). Accordingly, the State is entitled to the strongest legitimate view of the evidence and all legitimate and reasonable inferences which may be drawn therefrom. *Id.* It is our duty to affirm the conviction if the evidence, viewed under the appropriate standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).

Second degree murder is the knowing killing of another. T.C.A. § 39-13-210(a)(1) (2006). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b) (2006). A person attempts to commit second degree murder when he or she acts with intent to knowingly kill the victim and believes his or her conduct will cause the victim's death without further conduct on the person's part. T.C.A. § 39-12-101(a)(2) (2006).

Here, the defendant told the victim to do everything that he wanted her to do if she wanted to live. The defendant told the victim that no one would miss her if he killed her. The defendant held the back of the victim's head and forced his penis down her throat, making it difficult for her to breathe. As a result, the victim vomited, and the defendant again told her she was going to die. The defendant then got on top of the victim and put his knees on her chest while he choked her. The defendant told the victim, "Robin does what Robin wants to do. Robin wants to kill you, he'll do it." The victim lost consciousness several times, and each time she regained consciousness, the defendant's face was directly over hers. The defendant told the victim to take a good look at his face because it was the last face she would ever see on earth and again told her she was going to die. The defendant released his hold on the victim only after he received a phone call. There was sufficient evidence presented at trial that the defendant attempted to commit second degree murder. He acted with the intent to kill the victim by knowingly choking her. This issue is without merit.

There was also sufficient evidence presented at trial to support the defendant's convictions for aggravated rape and rape. Rape is the unlawful sexual penetration of a victim by the defendant accomplished by force or coercion. T.C.A. § 39-13-503(a)(1) (2006). Aggravated rape is the unlawful sexual penetration of a victim by the defendant, where the defendant causes bodily injury to the victim. T.C.A. § 39-13-502(a)(2) (2006).

At trial, the victim testified that the defendant told her to remove her clothes before he forced his penis into her mouth with his hands. He grabbed the back of her head and neck, causing her to vomit. The defendant also penetrated her vagina with both his penis and a rubber dildo. The defendant's choking of the victim caused her voice to become raspy and resulted in bruising about her face, neck, chest, and arms, which lasted for two weeks. The victim's tongue and throat were swollen for some time after the incident, and her ears bled the following day. The victim bled from her rectum and had blood in her stool for a month following the crimes. Her vagina was bruised and sore, causing her difficulty in urinating. Testimony was elicited at trial from a forensic nurse who observed the victim's injuries five weeks after the incident. She testified that the injuries were consistent with strangulation and that there was a possibility of cartilage or nerve damage. The detective that the victim contacted testified that he observed bruising on the victim's neck five days after the crime.

He testified that the victim told him that the defendant was responsible for the crime. The evidence presented was sufficient to demonstrate that the defendant forcibly penetrated the victim orally, vaginally, and anally and that she suffered bodily injury as a result.

Especially aggravated kidnapping is false imprisonment where the victim suffers serious bodily injury. T.C.A. § 39-13-305(a)(4) (2006). A person commits false imprisonment when he knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty. T.C.A. § 39-13-302 (2006). Serious bodily injury involves a substantial risk of death, protracted unconsciousness, or extreme physical pain. T.C.A. § 39-11-106(a)(34)(A)-(C) (2006). Aggravated kidnapping is false imprisonment committed to facilitate the commission of any felony or where the victim suffered bodily injury. T.C.A. § 39-13-304(a)(1) (2006). Here, the evidence reflects that the defendant locked the victim in his house in order to commit rape. The victim suffered serious bodily injury and survived several bouts of unconsciousness and severe physical pain due to the defendant's manually strangling her and penetrating her anally. The victim suffered injuries to her neck as a result of the strangulation. The evidence presented at trial was sufficient to support the defendant's convictions for both especially aggravated kidnapping and multiple counts of aggravated kidnapping. Here, the jury heard and accredited the victim's testimony regarding the three-hour ordeal in the defendant's home. There was sufficient evidence to convict the defendant on all counts.

The defendant also argues that the jury returned inconsistent verdicts. However, our supreme court has held that consistency between verdicts on separate counts of an indictment is not necessary because each count is a separate indictment. *Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973).

Next, the defendant argues that the trial court erred in admitting an audiotape into evidence because he contends the audiotape was hearsay as the witness, Bernice Phillips, could not authenticate all the voices on the recording. The defendant raised this issue in a motion to suppress the audiotape. However, during the hearing on the motion, he only contested whether anyone on the tape mentioned that the defendant was on parole because the witness was his parole officer. The State argues that the defendant abandoned the issue and did not give the trial court an opportunity to rule on the merits of the motion to suppress.

During the hearing on the motion to suppress, the defendant told the court that his problem with the audiotape was that his girlfriend mentioned that he was on parole. The defendant did not want any reference at trial that he was on parole. The trial court stated that the parole reference would be redacted. The defendant responded, "Okay. And that's our concern." The defendant said the trial court had addressed his issues.

The motion to suppress was heard by a different judge. Prior to trial, the judge asked the State if the other judge had ruled on the admissibility of the audiotape. The State replied that the issue had not been presented. The trial court asked if the defendant had been heard on the issue of whether the audiotape would fall under the fresh complaint exception to the rule against hearsay. The defendant said he objected to any mention that he had a parole officer. The State told the court that it could take care of the authentication because the witness could authenticate the voice of the defendant's girlfriend. The State pointed out that Rule 807 was a "completely different evidentiary issue" that allows a victim of sexual assault to bring in proof that she made a fresh complaint of the assault. The State contended that it was introducing the audiotape for the purpose of corroborating the victim's testimony.

The trial court ruled that the witness could not mention that she was the defendant's parole officer and that the trial would come to a "screeching halt" if she did mention it. The defendant stated that he had no objection to the admissibility of the audiotape; therefore, the defendant has waived this issue. Tennessee Rule of Criminal Procedure 12(b)(2)(C) provides that a motion to suppress must be presented prior to trial. Failure to do so constitutes a waiver of the issue unless the court grants relief for good cause. Tenn. R. Crim. P. 12(f)(1). The defendant abandoned the issue, and, therefore, it is waived.

Next, the defendant argues that the trial court erred in allowing the State to introduce the victim's pants into evidence. Specifically, the defendant argues that the chain of custody for the evidence was not properly authenticated.

The defendant was given an opportunity to object to the admission of the pants into evidence but declined to do so. Only on the following day, in a jury-out hearing, did the defendant inform the trial court that he had a motion to exclude the evidence. The defendant acknowledged that he should have objected to the admission of the pants. The trial court held that there had been sufficient identification of the evidence to meet the requirements of Tennessee Rule of Evidence 901, and we agree.

Next, the defendant argues that the trial court abused its discretion when it refused to grant a continuance after the State failed to provide written notice that it was seeking to qualify the defendant as a repeat violent offender. Tennessee law requires forty-five days of written notice prior to trial. If the notice requirement is not met, the defendant must prove he suffered prejudice from the lack of a timely notice.

Pursuant to the Repeat Violent Offender Act, defendants convicted of certain violent crimes who have a record of specified prior convictions qualify for an automatic sentence of life without parole. *See* T.C.A. § 40-35-120(g) (2006). The State is required to file with the court and defense counsel a statement that the defendant is a repeat violent offender within

forty-five days of the arraignment. *Id*. at (i)(2). The trial court shall grant the defendant a continuance if the notice is not timely filed to assure that the defendant has forty-five days between the date of notice and the trial. *Id*. The defendant is not entitled to release from custody or dismissal of the charges if the State does not comply with the notice provisions. *Id*. at (i)(3). This court has previously determined that a defendant must show he was prejudiced due to the untimely notice. *State v. Thompson*, 36 S.W.3d 102, 115-16 (Tenn. Crim. App. 2000).

Here, the defendant received notice thirty days prior to trial. He filed a motion for continuance on July 23, 2008, and noted that the trial was set for July 28, 2008. The defendant does not make any mention in his motion of the forty-five-day notice requirement for the repeat violent offender status. The State filed the repeat violent offender notice on June 24, 2008. The defendant's counsel was advised prior to trial that the defendant qualified as a repeat violent offender under Tennessee law. The State contends that the delay in filing the official notice was the result of authorities in Texas having difficulty locating the proper documentation for the conviction that occurred in 1983.

The defendant asked for a continuance at the pretrial hearing to locate a potential witness. The defendant also stated that he had just received notice that the State wanted to subpoena medical records for trial. The State replied that it made an effort to give the defendant every document prior to trial. The State then offered to the court that it had discussed the defendant's status as a repeat violent offender "early on in the case" but that there had been difficulty in securing verification of his conviction from Texas due to flooding in the area. The trial court granted a two-day continuance.

On appeal, the defendant has failed to demonstrate that he was prejudiced due to the State's failure to give forty-five-day written notice that the defendant qualified as a repeat violent offender. The notice was filed thirty-six days before the actual start of trial. The defendant has not demonstrated how he was prejudiced by losing the additional nine days.

Next, the defendant argues that the State violated the prior trial court order, which barred mention that he was on parole when he committed the underlying crimes. Specifically, he argues that the State should not have allowed the defendant's parole officer to take the defendant's file to the witness stand and that the presence of the file was prejudicial to him. However, the trial court noted that the file folder was blank and that the witness never said that she was his parole officer. The witness testified briefly that she knew the defendant and his girlfriend before the State asked for a recess. After the jury left the courtroom, counsel for the defendant asked that the file be removed. The defendant has failed to demonstrate on appeal that the presence of the file was so prejudicial that he should be granted a new trial. The court noted that the file had nothing written on its exterior to

show that it was a parole file.  Further, the defendant has not demonstrated that any juror knew that the folder was the witness's parole file on the defendant.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE